UNITED STATES DISTRICT COURT FOR
DISTRICT OF MARYLAND
Salisbury Division

| | |
|---|---|
| BLOOSURF, LLC ) | |
| ) | |
|    *Plaintiffs,* ) | |
| ) | |
|    v. ) | Civil Action No. _____ |
| ) | |
| UNIVERSITY OF MARYLAND EASTERN SHORE, ) | |
| ) | |
|    And ) | |
| ) | |
| SALISBURY UNIVERSITY ) | |
| ) | |
|    And ) | |
| ) | |
| WOR-WIC COMMUNITY COLLEGE. ) | |
| ) | |
|    *Defendants.* ) | |
| ) | |

## COMPLAINT

COMES NOW Plaintiff BLOOSURF, LLC (hereinafter "Bloosurf") and states as follows for its compliant against University Of Maryland Eastern Shore, and Salisbury University, and Wor-Wic Community College (hereafter, "the Universities"):

### INTRODUCTION

1.    Bloosurf is an internet service provider, servicing parts of the Eastern Shore in Virginia, Maryland and Delaware, that focuses on providing high speed 4G internet services to low-income and rural communities.

2.    In 2011, Bloosurf signed a long-term de-facto lease agreement with the Universities to utilize the lower and middle bands of the Educational Broadcast Service (or "EBS") spectrum frequencies that were granted to the Universities free of charge by the FCC. In exchange for use

of the frequencies, Bloosurf provided wireless internet service to the local community and shared a portion of the revenue with the Universities.

3.      When the lease was signed, none of the Universities were using their licensed frequencies that were given to them by the FCC. Under FCC rules at the time, failure to use their licensed frequencies would result in their forfeiture.

4.      As a result of Bloosurf's lease agreement, the Universities were able to maintain title to the licensed frequencies.  With the lease agreement, Bloosurf then invested public and private funds to build and operate a wireless network to provide internet service to low-income rural residents on the Eastern Shore.

5.      T-Mobile, a rival wireless Internet service provider and global telecommunications giant, has sought to establish a strong foothold on the eastern seaboard of the United States by consistently and steadily acquiring spectrum frequency bands through auctions conducted by the FCC.  In recent years it has been acquiring licenses to provide wireless internet service in areas surrounding and overlapping the area Bloosurf is licensed to operate in.

6.      Beginning in 2020, Bloosurf started to experience significant interference with its wireless internet service around Salisbury MD and the surrounding area.  A field test conducted by the FCC's Enforcement Bureau uncovered that T-Mobile had been transmitting on frequencies in an area that was not authorized to do so that interfered with Bloosurf's frequency and system. T-Mobile's interference in Bloosurf's network is a violation of FCC regulations. The FCC also found that T-Mobile had turned on their new 5G system on sites within range of Bloosurf's network without warning. 4G and 5G technologies can only coexist without harmful interferences when they are synchronized which there were not.

7.      T-Mobile's interference in Bloosurf's service area caused significant harm to the company including the loss of customers, revenue and reputation, including an inability to bid on the FCC Spectrum Auctions.

8.      In early 2022, the Universities demanded that Bloosurf consent to its transfer of the lease to a T-Mobile subsidiary. Bloosurf has refused to do so.

9.      As the vast majority of its operations relies on its lease continuing through 2029, Bloosurf declined to consent to the transfer of their rights prior to the end of the lease.  In addition, the Universities requested that Bloosurf waive all of its rights before the FCC, an obligation clearly outside the lease.  In effect, Bloosurf is unwilling to consent to a transfer that will resul in the termination of its wireless internet services on the Eastern Shore and force it to default on its remaining obligations through 2029.

10.     Bloosurf informed the Universities that their request was unreasonable and therefore not permissible under the terms of the lease.  Bloosurf then made a request under Maryland's Public Information Act ("the MPIA") for all records and communications between the Universities, T-Mobile and TDI seeking openness and transparency in their dealings since the licenses were granted by the federal government to benefit the public.

11.     Bloosurf received a letter from the Universities on November 17, 2022 threatening to terminate the contract unless Bloosurf agreed to the Universities' assignment of their rights to T-Mobile.  Notably, this threatened termination occurred after Bloosurf sent the MPIA request seeking the Universities' communications with T-Mobile regarding the EBS spectrum.

12.     Given the impropriety of the request under the lease, Bloosurf seeks an injunction (i) preventing the Universities from terminating the lease and terminating its FCC-approved

service, and (ii) preserving the lease to the end of its term in 2024, as well as declaratory relief renewing the lease for the additional 10-year term as set forth therein.

## PARTIES

13.    Plaintiff Bloosurf, LLC is a Delaware limited liability corporation with a principal place of business at 1222 Old Ocean City Rd, Salisbury, MD 21804, that regularly engages in business in Maryland. The principals of the Plaintiff are residents of the District of Columbia, Virginia and Maryland.

14.    Defendant University of Maryland Eastern Shore is a public university located at 11868 College Backbone Rd, Princess Anne, MD 21853

15.    Defendant Salisbury University is a public university located at 1101 Camden Ave, Salisbury, MD 21801

16.    Defendant Wor-Wic Community College is a public university located at 32000 Campus Dr, Salisbury, MD 21804

## VENUE AND JURISDICTION

17.     This court has jurisdiction as this concerns a lease and subsequent actions under the lease subject to the regulations of the FCC, a question of federal law. 28 U.S. Code § 1331.

18.     This court is the proper venue, given that it involves parties with the primary place of residence in Maryland and Maryland is where the majority of the events giving rise to this claim occurred. 28 U.S. Code § 1391.

## FACTUAL ALLEGATIONS

19.    Bloosurf incorporated in 2009 for the purpose of providing internet services to rural areas in the Delmarva peninsula, which consists of areas in Delaware, Maryland and Virginia.  To wit, Bloosurf provides high-speed internet in that area using a 4G LTE network

20.     On January 4 2011, Bloosurf signed a Long-Term De Facto Lease Agreement ("the EBS Lease") with the Universities to use the lower and middle bands of the EBS spectrum granted to them by the FCC. *See* FCC License attached as Exhibit A. *See also* De Facto Lease Agreement attached as Exhibit B.

21.     The Universities do not own these licenses, but rather they were granted (subject to revocation) to them by the FCC to promote public education services. The Universities were supposed to use the licenses for educational purposes that were later expanded to include the provisioning of broadband services.

22.     The Universities had not used their licenses at that time and risked forfeiture by the FCC based upon that failure.  Entering the EBS Lease prevented their forfeiture to the FCC.

23.     Besides preserving the licenses for the Universities via the EBS Lease,  Bloosurf has  invested millions of dollars to maintain service and thereby defend the spectrum and the licenses over the past ten (10) years.  If it were not for Bloosurf, the Universities would have lost the licenses ten years ago.

24.     Subsequent to the signing of the EBS Lease, Bloosurf and the Universities worked together for Bloosurf to obtain the associated licenses to operate until 2024,, meaning that the first lease period would extend through 2024.

25.     Notably, the EBS Lease consists of an original ten (10) year term, with two optional renewal periods – each being for ten (10) years. In total, the lease is structured for a maximum duration of thirty (30) years.[1]

26.     The lease is contingent on the FCC approval per 47 C.F.R. § 1.9030(e), as it represents a grant of Federal telecommunications authority, which was originally granted in a

---

[1] See Exhibit B, page 1, clause 1(a) of the EBS Lease.

Public Notice DA  No 11.178 dated April 21, 2011.

27.     Following the parties' agreement, the FCC subsequently approved the EBS Lease to Bloosurf with the following temporal limits, as demonstrated in Exhibit A:

> (a) Call-sign WNC436 (Salisbury's frequencies) from March 11th, 2011 to September 7th 2024;
>
> (b) Call-sign W437 (UMD Eastern Shore's frequencies) from March 9th, 2011 to September 7th, 2024;
>
> (c) Call-sign W463 (Wor-Wic's frequencies) from April 5th, 2011 to October 12th, 2024.

28.      Each FCC license allowed for the use of its specific broadband spectrum frequencies  within the designated area, a 35-mile radius from the respective broadcasting tower. See Exhibit B.

29.     Each EBS Lease allowed for the use of its specific broadband spectrum frequencies within the designated area, which is a 35-mile radius from the respective broadcasting tower. *See* Exhibit B.

30.     Further, under the lease, a party could seek to transfer their rights under the lease with the prior written consent from the other party. Exhibit B § 7.  That consent cannot be **unreasonably** withheld, conditioned, or delayed.  See id.

### Bloosurf's Operations and Expansions

31.     Upon entering the EBS Leases, Bloosurf has worked continuously to build rural broadband access in the Eastern Shore.  During that time, it has solicited multiple state and Federal funding partners to build out its network.

32.     Bloosurf has lived up to the terms of the lease since it was signed and has won

multiple State and Federal contracts to expand its network utilizing its EBS spectrum.  In 2010, Bloosurf won a $3.5 million grant/loan from the U.S. Department of Agriculture to build its high-speed wireless network to serve rural low-income house households on the Eastern Shore.

33.    In 2017, Bloosurf won a grant from the State of Delaware to pilot a 4G Fixed Wireless Access pilot network in its Seaford area, a rural area without consistent internet access.

34.    In 2018, Bloosurf competed in the "FCC Connect America Fund Phase 2" and received further grants from the FCC amounting to $5.5 million for the subsequent ten (10) years to upgrade and expand its network to cover 5,000 locations between Delaware and Maryland that lack consistent internet access.

35.    In 2019, Bloosurf won another contract from the state of Delaware to extend its wireless broadband network using its EBS spectrum to additional areas in Sussex and Kent County.

36.    In October 2020 during the height of the Covid Pandemic, the state of Delaware provided Bloosurf with additional funding to provide Internet service to public school students who were sent home for remote learning.  All of the students were from low-income families and eligible for a State subsidy of $30 per month.  The contract called for Bloosurf to install up to 250 households per month under this contract.[2]

37.    The contract with the state of Delaware was to last for seven (7) years and was based on the stated intent of the Universities that Bloosurf's EBS spectrum lease was good through 2024 and would be renewed for each of the additional ten (10) years per the EBS Lease.

38.    In April of 2021, in the hopes of raising private capital to accelerate its growth Bloosurf  hired KPMG to conduct a preliminary evaluation given its most recent and preceding

---

[2] In Fall 2020, Bloosurf began to experience interference with its wireless network on its EBS spectrum, coming from an outside source, that impacted the company's ability to provide service to the students.  The interference was coming from T-Mobile.

financial performance. KPMG valued Bloosurf between $30 and $35 million dollars before the interference with T-Mobile was detected.

39.     At present, Bloosurf generates about $1 million dollars a year in customer revenue from its business operations utilizing the leased spectrum, in addition to the revenue generated by government and nonprofit grants.

**T-MOBILE'S INTERFERENCE**

40.     T-Mobile, Inc. is a global internet and telecommunications provider and a dominant presence in the digital-telecommunication market throughout the world.

41.     The broadband spectrum licenses leased by Bloosurf operated under the lease represent key bands for T-Mobile's strategy to comprehensively cover the Eastern Shore area with T-Mobile's 5G Network. The broadband spectrum licenses leased by Bloosurf are highly sought-after bands for T-Mobile's 5G service covering the Eastern Shore.

42.     From 2011 to 2020, Bloosurf suffered little to no network interference and provided quality high speed 4G internet on the Eastern Shore in accordance with the multitude of governmental contracts and grants it had received.

43.     In the fall of 2020, Bloosurf began receiving complaints of interference on its network from a foreign source; apparently another service provider was using frequencies that were bleeding into the band to which Bloosurf had exclusive rights.

44.     In December 2020, Bloosurf confirmed via a spectrum analyzer that it was suffering from outside interference.

45.     This analyzer indicated that third parties were broadcasting frequencies from nearby towers that were interfering with Bloosurf's service.

46.     In late January 2021, Bloosurf contacted T-Mobile, as Bloosurf suspected that it

was utilizing (illegally) the nearby towers.

47.     In doing so, Bloosurf notified T-Mobile that it was experiencing interference, and asked T-Mobile whether it was the source.

48.     On January 25, 2021, T-Mobile responded to Bloosurf's query by stating that two undisclosed towers near Bloosurf's geographic area of coverage may be responsible for the interference; however, T-Mobile later assured Bloosurf, after running its own frequency tests, that it was not the source of the interference.

49.     On February 4, 2021, T-Mobile ran a joint test with Bloosurf to determine whether its towers were the source of the interference. These towers were located in distant regions: specifically, the District of Columbia, New Jersey and Pennsylvania.

50.     In the early hours of the morning, T-Mobile reported that it had stopped broadcasting from its towers while Bloosurf observed whether the interference was resolved. In doing so, Bloosurf relied on T-Mobile's assurance that its broadcasting was turned off, however, the interference remained.

51.     Unable to discover the source and still experiencing the interference, Bloosurf contacted the FCC in May 2021.

52.     The FCC responded by conducting its own tests on the interference, particularly in the Seaford region of Delaware.  In doing so, the FCC requested T-Mobile to cease transmitting from several towers, including one in the Seaford region of Delaware.

53.     The FCC investigation concluded that T-Mobile had been operating over the FCC threshold at 17.4 MHz rather than its authorized 15 MHz hence encroaching on Bloosurf's frequency, identifying  the source of the interference with Bloosurf's network.

54.     During that time period and as late as December 2020, T-Mobile had begun its 5G

rollout in the surrounding area, transmitting frequencies that where "asynchronous" with Bloosurf's 4G LTE network. This meant that if the two networks broadcasted within a certain radius, Bloosurf's 4G network would be drowned out by T-Mobile.

55.     T-Mobile responded to the FCC's test conclusion by apparently correcting its transmission frequencies. And while the interference has improved, it has not gone away entirely – which means that T-Mobile remains not just a competitor, but an active source of interference, within the authorized service area of Bloosurf.

56.     Further interference by T-Mobile is devastating to Bloosurf's business because it would render it unable to provide adequate services to its consumers.

57.     Since T-Mobile was notified of the interference, it has been attempting to take control of the broadband spectrum leased by Bloosurf, either by attempting to negotiate with Bloosurf or by seeking to purchase the underlying EBS licenses from the Universities.

## BLOOSURF REQUESTS LEASE EXTENSION BUT INSTEAD IS PRESENTED WITH  PROPOSED ASSIGNMENT TO ITS COMPETITOR T-MOBILE

58.     The FCC responded by conducting its own tests of the interference including in the town of Seaford, Delaware Requesting that T-Mobile cease transmitting from several towers including the one in Seaford.

59.     While all this has been occurring, Bloosurf began negotiating with the Universities for an extension of the EBS Leases, which are set to expire in September-October 2024, per the initial term. Corresponding with a lawyer representing the University of Maryland at Salisbury, Mr. Cohan, Bloosurf was told that the Universities was soliciting offers for use of the EBS license following the 2024 deadline. That university asked Bloosurf to make an offer.

60.     In July 2021, Bloosurf submitted an offer to Mr. Cohan in line the price it paid for

the Citizens Broadband Radio Service spectrum it acquired a year before. Bloosurf did not hear from Mr. Cohan for another 6 months.

61.     To date, no response was ever provided regarding the extension of the lease

62.     During this time, Bloosurf requested that the Universities begin negotiations for renewal of the ten-year lease as called for in the lease agreement (cite relevant section).  While Bloosurf was awaiting a reply from the Universities, a lawyer representing the Universities, Steve Coran, asked Bloosurf if it would be interested in purchasing the licenses instead of renewing them.

63.     In July 2021, Bloosurf submitted a good faith offer to purchase the licenses based on a fair market price established at a previous FCC spectrum auction.

64.     To date, Mr. Coran never responded to Bloosurf's good faith offer to purchase the licenses and never responded to Bloosurf's original request for a renewal of the lease.

65.     In January 2022, Bloosurf was contacted by the Universities and asked to consent to an assignment of its rights under the EBS Lease to TDI– **a Delaware corporation which is a subsidiary of T-Mobile (hereafter "TDI").** *See* proposed Consent to Assignment ("the Proposed Assignment") attached as Exhibit C.

66.     Any such transfer would need to be approved by the FCC, pursuant to the FCC Regulations as well as the terms of the EBS Lease.

67.     Under Section 7 of the Lease, Bloosurf has the right reasonably withhold consent of any assignment. It has exercised that right due to the serious implications such an assignment would have on its business.

68.     This withholding of consent is entirely proper and reasonable.

69.     For example, In 2019, Bloosurf was awarded a ten-year $5.5 million contract by

the FCC to provide broadband service to rural customers. *See* ¶ 30.  An assignment of the leases would terminate service under this contract and place Bloosurf in default to the United States government.

70.     The Proposed Assignment <u>also</u> asked Bloosurf to acquiesce before the FCC to the transfer, an obligation outside of any terms contained in the EBS Lease.

71.     Specifically, the Proposed Assignment stated that: *"Bloosurf agrees to not object to, interfere with or delay the FCC's consent."*

72.     Again, given this additional and extralegal requirement and the devastating impact on Bloosurf's business, it was reasonable for Bloosurf to withhold consent to the Proposed Assignment.

73.     Section 11(f) of the Lease states "The Agreement will not be assigned to any entity that is ineligible or unqualified to enter into a spectrum leasing arrangement under the FCC Rules."

74.     To date, the universities have not certified to Bloosurf that TDI is an eligible recipient under FCC regulations to receive the assignment for the license leases.

75.      At no point has Section 11(f) been satisfied by the defendants. In fact, assigning a license provided under the Educational Broadband Service to a multinational conglomerate subsidiary contradicts the stated purpose of the Educational Broadband Service.[3]

76.     As a subsidiary of the largest telecommunications company in the world, TDI would not meet any of the Designated Entity Provisions under the Federal Register. 47 C.F.R. § 27.1219.

77.     TDI is part of a conglomerate that far exceeds the maximum revenue provisions set

---

[3] *See* Broadband Radio Service & Education Broadband Service , Federal Communications Commission, accessed at https://www.fcc.gov/wireless/bureau-divisions/broadband-division/broadband-radio-service-education-broadband-service (December 15, 202).

forth by the FCC regulations.

78.     Further, TDI would not meet the educational requirements to hold the licenses. 47
C.F.R. § 27.1205.

79.     After the Proposed Assignment was made by the Universities and while the
investigation to the unwarranted interference was continuing, Bloosurf entered into negotiations
with T-Mobile in attempt to reach an amicable solution.

80.     Around August 2022, T-Mobile admitted that it desired to acquire all the spectrum
under the EBS Leases.  Thus, these negotiations were to no avail.

## BLOOSURF ACTS TO PROTECT ITSELF
## THE UNIVERSITIES THREATEN TO TERMINATE EBS LEASE

81.     T-Mobile won FCC Auction 108 for licenses to transmit on a competing 2.5 GHz
network in an area which surrounds and overlaps the area covered by Bloosurf's service area.

82.     On September 2022, after the auction T-Mobile contacted Bloosurf to acquire the
spectrum licensed to Bloosurf now and in the future. Negotiations took place under NDA including
a possible acquisition of Bloosurf and failed in October 2022.

83.     On November 3rd and 4th, in the wake of the Proposed Assignment as well as T-
Mobile's aggressive actions to usurp Bloosurf's service area, Bloosurf through its attorneys' sent
requests under the Maryland Public Information Act ("MPIA")to the Universities for all records
reflecting communications with T-Mobile about the EBS Lease and its efforts to obtain the
frequencies for its own use. *See* MPIA Requests attached as Exhibit D

84.     Under § 4-203 of the Maryland Code, entities obligated to produce information
under the MPIA must give notice within ten (10) working days of the request being submitted on
how long it will take for the information to be released.

85.     On November 17th 2022, on the same day a response was required from the

Universities under MPIA, Bloosurf received a letter from the Universities lawyers stating that Bloosurf was in material breach of the lease and that the universities intended to "terminate" the lease unless Bloosurf provided the requested consent to the Proposed Assignment. *See* Intent to Terminate letter attached as Exhibit E

86.     As of this date, no response had yet been received from the Universities to the MPIA request other than notifications that "more time" would be needed to respond. *See* MPIA Response Emails attached as Exhibit F

87.     On November 21, 2022, with the MPIA requests pending and having received the Intent to Terminate letter, Bloosurf submitted to the FCC a "request for investigation," requesting that the FCC investigate T-Mobile's actions in the Eastern Shore market, including its continued interference with Bloosurf's network. *See* Request for Investigation attached as Exhibit G.

88.     On November 23, 2022, Bloosurf submitted its response to the Universities' letter, explaining why it had "reasonably" withheld its consent and asking the Universities to withdraw the Intent to Terminate notice. *See* Bloosurf Letter of November 23, 2022 attached as Exhibit H

89.     On December 2, 2022, the Universities responded that they had no intention to withdraw their request and again asked Bloosurf to consent to the Proposed Assignment before December 19, 2022. *See* University Response attached as Exhibit I

90.     Such an assignment would be disastrous to Bloosurf's business and lead to its eventual dissipation in 2024.  It would leave thousands of low income and rural households with suitable high-speed internet.

91.     Based on the Universities unreasonable position in attempting to assign the lease to an antagonistic party (or otherwise terminate the lease), Bloosurf seeks to enjoin the Universities from terminating the lease and enjoying all further assignment to TDI.

92.     The Universities' request is unreasonable in that it also request Bloosurf assist the parties in facilitate the transfer to TDI with the FCC.

93.     An injunction pending the result of this suit is necessary to preserve irreparable damage to Bloosurf and its business operations.

<u>**COUNT I– Temporary Injunction Against University to Prevent Termination**</u>
<u>**Of EBS Lease and Ensuing Loss of FCC Licenses**</u>

94.     Plaintiffs incorporate by reference into this Count all of the allegations stated in the preceding paragraphs.

95.     Defendants have threatened to terminate the lease between the parties unless Bloosurf consents to the assignment of the lease to T-Mobile by December 19, 2022.

96.     Given the precipitous effects on Bloosurf, it is necessary to enjoin the universities from terminating this lease until the conclusion of this matter.

97.     A preliminary injunction is considered to be an "extraordinary remedy" that is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

98.     A preliminary injunction is only appropriate when a plaintiff establishes that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

99.     From the facts of this case, it is likely that the Court will find that the withholding of consent, given T-Mobile's prior actions, is reasonable under Section 7 of the lease.

100.    Bloosurf withheld this consent due inter alia to the requirement proffered by the Universities that "Bloosurf agrees to not object to, interfere with or delay the FCC's consent" as well as to the fact that the beneficiary is a subsidiary of a corporation that has interfered with Bloosurf's business operations.

101.   Bloosurf has further withheld consent due to the irreparable damage to Bloosurf's business operations that would be required to immediately cease.

102.   Further, Bloosurf has withheld consent as TDI is an ineligible receipt under the FCC EBS regulations, namely 47 C.F.R. § 27.129 and 47 C.F.R. § 27.1205.

103.   Under the terms of the lease, the lease cannot be assigned to an ineligible recipient

104.   If the University is allowed to terminate the lease, it will cause irreparable harm to Bloosurf, who will be unable to conduct its business and will lose $1.5 million in annual revenue.

105.   If the lease is terminated and Bloosurf is successful on the merits, significant barriers exist to unwind the termination.

106.   On the other hand, the Universities would suffer no prejudice if a temporary injunction were granted, as the *status quo* would still be preserved with no resulting damage.

107.   The public interest would call for enjoining the termination, as it would be unjust to allow the universities to terminate the lease after an reasonable withholding of consent of a transfer to a large corporation that has routinely interfered with Bloosurf's business operation in the Eastern Shore.

108.   Accordingly as all the requirements for a preliminary injunction have been met under Federal Law, this Court should enjoin the Universities from terminating the EBS leases with Bloosurf until the complete resolution of this matter before the Court.

<u>**COUNT II- Declaratory Relief and Permanent Injunction**</u>
<u>**to Prevent Termination of EBS Lease**</u>
<u>**And Ensuing Loss of FCC Licenses**</u>

109.   Plaintiffs incorporate by reference into this Count all of the allegations stated in the preceding paragraphs.

110.   The Universities seek to terminate the EBS Lease due to Bloosurf failing to consent

to the Proposed Assignment.

111.     Bloosurf withheld this consent due inter alia to the requirement proffered by the Universities that "Bloosurf agrees to not object to, interfere with or delay the FCC's consent" as well as to the fact that the beneficiary is a subsidiary of a corporation that has interfered with Bloosurf's business operations.

112.     Further, Bloosurf has withheld consent as TDI is an ineligible receipt under the FCC EBS regulations, namely 47 C.F.R. § 27.129 and 47 C.F.R. § 27.1205.

113.     Under the terms of the lease and FCC regulations, the lease cannot be assigned to an ineligible recipient.

114.     As indicated in Bloosurf's November 23, 2022 letter, any withholding of consent from the Proposed Assignment was entirely reasonable.

115.     Section 7 only precludes a party from unreasonably withholding, conditioning or delaying the consent.

116.     In contrast, the Universities' condition that Bloosurf not object to the FCC's consent is unreasonable, given T-Mobile's prior actions.

117.     Given the effects that a termination of the EBS Lease would have and the lack of proper justification, it is necessary to permanently prevent the universities from assigning the licenses to T-Mobile and its subsidiaries.

118.     As elaborated *supra,* if the lease is terminated Bloosurf will suffer irreparable damage as it will need to immediately cease is business operations that rely on the leased spectrum.

119.     Additionally, it would be impossible to unwind a termination of the lease, given the FCC consent required to enter into a new lease for licensed spectrum.

120.     The Universities should be enjoined from terminating the lease with Bloosurf for

any of the reasons stated in its December 2, 2022 letter, namely the assignment to TDI and Bloosurf withholding its consent.

121.    Accordingly, this Court should enjoin the Universities from terminating the lease for Bloosurf's withholding consent for the assignment of the lease to TDI.

122.    Further, this Court should declare that Bloosurf has the right to extend the EBS Lease and, thereby, compel the universities to renew the lease for the upcoming 10-year term in accordance with the Universities' stated intent

## COUNT III – Breach of Contract (alternative)

123.    Plaintiffs incorporate by reference into this Count all of the allegations stated in the preceding paragraphs.

124.    This Count is plead in the alternative to the injunctive and declaratory relief and based on the improper termination of the lease by the universities.

125.    Under the EBS Lease, Bloosurf leases the broadband spectrum licensed to the universities under the FCC's Educational Broadband Service, 47 CFR §. 27.1200 et. seq.

126.    Plaintiffs generate an approximate $1 million a year in customer revenue in their ventures using the leased spectrum and expect to do so for at least the next 7 years through 2029.

127.    A termination under the lease would cause Bloosurf to lose on approximately $7 million in lost revenue.

128.    Each party to the EBS Lease has a duty to follow its provisions and all applicable FCC regulations, per Section 11 of the lease.

129.    This requires the parties to take all actions within full accordance with FCC regulations or with full approval of the FCC.

130.    The termination of the contract has been threatened as a result of Bloosurf's proper

withholding of consent is a breach of the duties under the contract when the Universities attempted to effectuate a transfer that would irreparably damage the Bloosurf's business to an ineligible recipient under FCC regulations.

131.   If the Universities carry out the termination, they will be in breach of the EBS Lease terms as well as the pertinent FCC regulations for unreasonably terminating the lease without proper cause, which itself is a Lease violation.

132.   Bloosurf will be unable to operate its business or utilizes the leased spectrum after the termination, causing it to default on its obligations and lose significant revenue streams.

133.   For example, Bloosurf has a grant from the FCC for the Connect America Fund Phase II that generates approximately five-hundred and fifty thousand dollars ($550,000) a year and was granted to Bloosurf through  2029.

134.   Because of the Universities' termination of the agreement without proper justification, in violations of the terms of the lease and applicable FCC regulations, Bloosurf would be now ineligible to receive the final 7 years of grants, valued at an approximate $3.85 million dollars for the 7-year period.

135.   The loss of this revenue is the direct result of the Universities' unlawful breach of the lease agreement.

136.   Accordingly, Bloosurf will suffer $10.85 million dollars in damage from the breach by the Universities of the EBS Lease, which roughly approximates the net revenue it would earn from its consumers and receive from the FCC (after expenses) from the use of the EBS under the Lease through its current termination date (and expected extension).

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, this Honorable Court should enter judgment for Bloosurf LLC in this matter and enter an order:

1) Granting a Temporary Injunction, which prevents the universities from terminating the EBS Lease (or taking any other action which threatens the FCC licenses of Bloosurf) until the conclusion of this litigation;

2) Permanently enjoining the Universities from terminating the EBS Lease (or taking any other actions which threatens the FCC licenses of Bloosurf);

3) Finding that Bloosurf is not in default in the EBS Lease but conversely has a right to extend the EBS Lease pursuant to the terms thereof;

4) Alternatively, if the Universities terminate this lease prior to the resolution of this matter, awarding Bloosurf $10,850,000 in damages as a result of the Universities' unjustifiable termination.

5) All further relief that this Court deem just and proper.

Dated: December 16, 2022

Respectfully Submitted,

BLOOSURF, LLC

By Counsel

_____/s/ J. Chapman Petersen /s/_____
J. Chapman Petersen, Esq., MD Bar # 0101110007
Ibnul Khan, Esq., MD Bar # 200319008
Chap Petersen & Associates, PLC
3970 Chain Bridge Road
Fairfax, VA 22030
Telephone 571-459-2512
Facsimile 571-459-2307
jcp@petersenfirm.com
ik@petersenfirm.com
*Counsel for the Plaintiffs*