# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BLOOSURF, LLC, | * | |
| *Plaintiff.* | * | |
| v. | * | Civil No. RDB-22-3254 |
| UNIVERSITY OF MARYLAND | * | |
| EASTERN SHORE, *et al.,* | * | |
| *Defendants.* | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Bloosurf, Inc. ("Bloosurf"), provides wireless internet service to low-income, rural communities on the Eastern Shore of Maryland. (Compl. ¶ 1, ECF No. 1.) Defendants, the University of Maryland Eastern Shore, Wor-Wic Community College, and Salisbury University (the "Universities"), are institutes of higher education located in the Eastern Shore. (*Id.* ¶¶ 14–16.) In 2011, the parties entered into a lease agreement (the "EBS Lease") granting Bloosurf access to the Universities' FCC-approved Educational Broadcast Service ("EBS") licenses for its wireless network. (*Id.* ¶¶ 2–4.) In 2022, the Universities proposed a sale of their EBS licenses to T-Mobile USA, LLC ("T-Mobile"), Bloosurf's direct competitor. (*Id.* ¶¶ 8–9.)[1] When Bloosurf refused to consent, the Universities threatened to terminate the EBS Lease. (*Id.* ¶¶ 10–11.) In the operative Complaint, Bloosurf seeks injunctive and declaratory relief: (1) preventing the Universities from terminating the Lease; (2) preserving the Lease through the end of its term; and (3) renewing the Lease for an additional 10-year term. (*Id.* ¶ 12.)

---

[1] Although T-Mobile features heavily in the parties' dispute, it is not a party to this action.

Three motions are now pending. Bloosurf has filed a motion for preliminary injunction, (ECF No. 9), and the Universities have moved to dismiss this case for lack of subject matter jurisdiction, (ECF Nos. 20, 22.) The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons that follow, Defendants' Motions to Dismiss (ECF Nos. 20, 22) are hereby **GRANTED**, and Bloosurf's motion for preliminary injunction (ECF No. 9) is hereby **DENIED** as moot.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). Plaintiff Bloosurf, Inc. ("Bloosurf") provides high-speed internet to rural households and communities in the Eastern Shore region of Maryland, Virginia, and Delaware. (Compl. ¶¶ 1, 19, 31–37.) Defendants, the University of Maryland Eastern Shore, Wor-Wic Community College, and Salisbury University (the "Universities"), are three institutes of higher education who are located in the Eastern Shore. (*Id.* ¶¶ 14–16.) All three Universities were granted licenses by the Federal Communications Commission ("FCC") to use designated broadcast frequencies under the FCC's Educational Broadband Service ("EBS") program. (*Id.* ¶¶ 20–21.)

### I. The EBS Lease

This case concerns the termination of a lease agreement between Bloosurf and the Universities for the use of the Universities' FCC-approved EBS licenses. On January 4, 2011, Bloosurf entered into a lease agreement (the "EBS Lease") with the Universities for use of the

lower and middle spectrum bands authorized under the Universities' EBS broadband licenses. (*Id.* ¶¶ 2–4, 20–29.) The FCC approved this lease by issuing a "Spectrum Leasing Agreement" that provided Bloosurf with the Universities' formal callsigns and extended the lease term until 2024. (*Id.* ¶ 27.)[2]

The EBS Lease was effective for an initial ten-year term followed by two ten-year renewal periods at the option of the parties, yielding a maximum potential term of thirty years. (*Id.* ¶ 25.) The parties had limited authority to terminate the agreement, or to assign or transfer their rights and obligations during the lease term. (*See* EBS Lease §§ 7–11, ECF No. 1-3.) As relevant, either party could terminate the lease upon a material breach, provided that the non-breaching party first provide notice of the grounds for the breach and a thirty-day opportunity to cure. (*Id.* § 8.) Each party was prohibited from assigning or transferring their rights without the other party's prior written consent, although such consent could not "be unreasonably withheld, conditioned, or delayed." (*Id.* § 7.) And neither party could assign their rights "to any entity that is ineligible or unqualified to enter into a spectrum leasing agreement under the FCC Rules." (*Id.* § 11(f).)

During the initial ten-year EBS Lease term, Bloosurf won grants from several state and federal agencies to provide broadband internet services in rural counties throughout Maryland and Delaware. (Compl. ¶¶ 31–36.) As alleged in the Complaint, these contracts and grants include: (1) a 2010 grant from the Department of Agriculture to expand service to low-income

---

[2] Specifically, Salisbury University received Call-sign WCN436 from March 11, 2011, to September 7, 2024; University of Maryland Eastern Shore received Call-sign W437 from March 9, 2011, to September 7, 2024; and Wor-Wic Community College received Call-sign W463 from April 5, 2011, to October 12, 2024. (*Id.*)

households, (*id.* ¶ 32); (2) a 2017 grant from the State of Delaware to test a 4G pilot network in the rural Seaford region of Delaware, (*id.* ¶ 33); (3) a 2018 grant from the FCC to expand its network over the next ten years, (*id.* ¶ 34); (4) a 2019 contract from Delaware to extend its network to Sussex and Kent County, (*id.* ¶ 35); and (5) a 2020 grant to expand service to low-income households with students who were sent home for remote learning at the height of the COVID-19 pandemic, (*id.* ¶ 36). Bloosurf claims that it "has invested millions of dollars" into its network, (*id.* ¶ 23), that it is currently valued at about $30 to $35 million dollars, (*id.* ¶ 38), and that it "generates about $1 million dollars a year in customer revenue from its business operations utilizing the leased spectrum," (*id.* ¶ 39). It also claims that "the vast majority of its operations rel[y] on its lease continuing through 2029." (*Id.* ¶ 9.)

## II. Signal Interference by T-Mobile

Throughout the initial term of the EBS Lease, Bloosurf alleges that it was able to fulfill all of its contractual obligations, and to provide service to its customers without interruption. (*Id.* ¶ 42.) However, in the fall of 2020, Bloosurf's customers began to experience service disruptions caused by signal interference from another provider. (*Id.* ¶¶ 43–45.) Bloosurf ran internal tests and confirmed that the signals originated with an external source, (*id.* ¶¶ 44–45), and soon began to suspect that this interference was caused by competing signals from towers installed by T-Mobile USA, LLC ("T-Mobile"), (*id.* ¶ 46).

In January 2021, Bloosurf contacted T-Mobile to inquire as to whether T-Mobile's new 5G towers were interfering with Bloosurf's 4G-LTE network. (*Id.*) Bloosurf and T-Mobile conducted joint tests of T-Mobile's equipment in the District of Columbia, New Jersey, and Pennsylvania, but were unable to conclusively determine the source of the signal interference.

4

(*Id.* ¶¶ 46–50.) In May 2021, Bloosurf escalated to the FCC. (*Id.* ¶ 51.) Between May 2021 and March 2022, the FCC conducted its own investigation, and determined that T-Mobile was broadcasting its new 5G network outside its FCC-approved frequency bands. (*Id.* ¶¶ 52–54.) According to the Complaint, the FCC's findings revealed that T-Mobile was "encroaching on Bloosurf's frequency" by broadcasting its signals "over the FCC threshold at 17.4 MHz rather than its authorized 15 MHz." (*Id.* ¶ 53.) Following the FCC's tests, T-Mobile corrected its transmission frequency. (*Id.* ¶ 55.) However, Bloosurf alleges that the interference "has not gone away entirely—which means that T-Mobile remains not just a competitor, but an active source of interference within [Bloosurf's] active service area." (*Id.*) Bloosurf alleges that further interference would be "devastating" to its business and prevent it from providing adequate services to its consumers. (*Id.* ¶ 56.)

### III.    Renewal Negotiations

As the investigations into the alleged interference proceeded, the prospect of renewal became a priority for the parties. After initial negotiations with the Universities, Bloosurf made an offer to renew the EBS Lease in July 2021, but did not receive a response. (*Id.* ¶¶ 60–64.) Bloosurf soon discovered that it was not the only interested party. In January 2022, the Universities emailed Bloosurf requesting consent to assign the EBS Lease to TDI Acquisition Sub, LLC ("TDI"), a Delaware corporation registered as a subsidiary of T-Mobile, (*Id.* ¶ 65). Attached was a proposed Consent Agreement, under which Bloosurf would waive its right to contest the sale and promise not to interfere with the FCC's approval process. (*Id.* ¶¶ 70–71.) Bloosurf alleges that T-Mobile pursued this sale specifically "to take control of the broadband

spectrum leased by Bloosurf" by "purchas[ing] the underlying EBS licenses from the Universities." (*Id.* ¶ 57.)

Bloosurf refused to consent, insisting that the transfer would interfere with its business, and that T-Mobile was ineligible to hold EBS licenses under federal law. (*Id.* ¶¶ 66–70, 72–75; *see also id.* ¶ 9 ("Bloosurf is unwilling to consent to a transfer that will resul[t] in the termination of its wireless internet services on the Eastern Shore and force it to default on its remaining obligations through 2029.").) According to the operative Complaint, negotiations reached an impasse, (*id.* ¶¶ 79–80), and in November 2022, the Universities sent Bloosurf a letter announcing their intention to terminate the EBS Lease on the ground that Bloosurf was in material breach for unreasonably withholding its consent to the proposed sale, (*id.* ¶¶ 83–85). Bloosurf replied on November 23, 2022, declaring that it was reasonably withholding consent because a sale to "a national telecommunications provider which over the past two years has actively interfered with Bloosurf's rural broadband service on the Delmarva Peninsula" would "degrade Bloosurf's commitment to provid[ing] broadband services to underserved areas in Maryland, Delaware, and Virginia." (Bloosurf Objection 2–3, ECF No. 1-9; Compl. ¶ 88.)

Bloosurf filed its operative three-count Complaint in this Court, seeking a temporary injunction, a permanent injunction, and declaratory relief. (*Id.* ¶¶ 94–108 (Count I); *id.* ¶¶ 109–22 (Count II).)[3] Specifically, Bloosurf seeks injunctive and declaratory relief (1) preventing the Universities from terminating the EBS Lease; (2) preserving the EBS Lease to the end of its initial term, in 2024; and (3) renewing the EBS Lease for an additional 10-year term. (*Id.* ¶ 12.)

---

[3] Bloosurf voluntarily dismissed Count III, alleging breach of contract, without prejudice. (*See* Notice of Partial Voluntary Dismissal, ECF No. 27.)

As Bloosurf notes in its briefing, "Bloosurf filed suit . . . in order to preserve its business, which is dependent on Federal and state appropriations, its access to the EBS spectrum and its ability to serve its Eastern Shore customer base in Maryland, Virginia and Delaware." (Pl.'s Resp. Opp. 7, ECF No. 26.) Bloosurf shortly filed its pending preliminary injunction motion, (ECF No. 9), and the Universities filed their Motions to Dismiss on February 9, 2023 (ECF Nos. 20, 21). These motions are now ripe for review.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint. *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). A challenge to jurisdiction under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In determining whether jurisdiction exists, the district court "is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768–69 (4th Cir. 1991). The plaintiff bears the burden of proving the existence of subject matter jurisdiction by a preponderance of the evidence. *Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999).

7

## ANALYSIS

The overriding issue presented by the Universities' motion is whether Bloosurf's claims for injunctive and declaratory relief arise under federal law. United States District Courts are courts of limited jurisdiction and possess only the "power authorized by the Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)); *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 431 (4th Cir. 2014). Accordingly, this court "may not exercise jurisdiction absent a statutory basis," *Exxon Mobil*, 545 U.S. at 552, and must presume that a case lies outside its limited jurisdiction unless and until the exercise of federal jurisdiction has been shown to be proper, *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (citation omitted).

Bloosurf invokes this Court's federal question jurisdiction.[4] Pursuant to 28 U.S.C. § 1331, the district courts possess original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." *See* U.S. Const. art. III, § 2 ("The judicial power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . . under their Authority."); *see also Exxon Mobil Corp.*, 545 U.S. at 552. "[A] case can 'aris[e] under' federal law in two ways." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). First, and most commonly, "a case arises under federal law when federal law creates the cause of action asserted." *Gunn*, 568 U.S. at 257; *see also American Well Works Co. v.*

---

[4] Diversity jurisdiction is unavailable in this case. According to the Complaint, all three Universities are located in Maryland, and Bloosurf is a Delaware limited liability company with some principal members in Maryland. (Compl. ¶¶ 13–16.) Consequently, there is not complete diversity among the parties. *See Central W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) ("For purposes of diversity jurisdiction, the citizenship of a limited liability company . . . is determined by the citizenship of all its members."); 28 U.S.C. § 1332(c) (providing that a corporation "shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.").

*Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) ("A suit arises under the law that creates the cause of action"). Second, in a "slim category of cases," a claim that has its genesis in state law may be deemed to arise under federal law if "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 208 (4th Cir. 2022) (quoting *Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019)); *accord Empire HealthChoice Assur. Inc. v. McVeigh*, 547 U.S. 677, 690 (2006); *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 13 (1983).

Only the second, narrow category is at issue here. Although Bloosurf does not precisely indicate what cause of action it asserts as the basis for its requests for injunctive and declaratory relief, the Complaint raises contractual claims, and does not present a federal cause of action. Throughout the Complaint, Bloosurf describes this case as an effort to prevent the termination of the EBS Lease, and to withhold consent to the T-Mobile Sale. (*See, e.g.*, Compl. ¶¶ 9–12.) In its description of the parties' dispute, the plaintiff places significant weight on its reasons for withholding consent, its specific objections to the sale, the threatened termination of the lease, and the two lease provisions that form the basis of its claims. (*See, e.g.*, *id.* ¶¶ 9, 12, 65; *see id.* ¶ 67 (citing Section 7); *id.* ¶ 11(f) (citing Section 11).) Moreover, Bloosurf characterizes its requested relief as an effort to preserve the EBS Lease, explaining:

> Given the impropriety of the request under the lease, Bloosurf seeks an injunction (i) preventing the Universities from terminating the lease and terminating its FCC-approved service, and (ii) preserving the lease to the end of its term in 2024, as well as declaratory relief renewing the lease for the additional 10-year term as set forth herein.

(*Id.* ¶ 12.) And to the extent Bloosurf invokes FCC regulations, it does so only as one of the *grounds* on which it withheld its consent to the transfer and continues to object to the proposed sale, (*see id.* ¶¶ 73–78), not as an independent cause of action.

Accordingly, the Complaint is best understood as seeking declaratory and injunctive relief on the basis that the termination of the EBS Lease and the sale of the Universities' underlying licenses would violate the Lease. These claims sound in contract, a quintessential field of state law. *See DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54 (2015) ("[T]he interpretation of a contract is ordinarily a matter of state law . . . ."). Bloosurf must therefore show that its "right to relief necessarily depends on resolution of a substantial question of federal law." *Mayor & City Council of Baltimore*, 31 F.4th at 208 (quoting *Burrell*, 918 F.3d at 380). "To ensure complaints alleging only state-law claims are not in federal court when they merely implicate federal issues, the Supreme Court established a four-prong test for determining the existence of federal-question jurisdiction." *Id.* at 209 (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)). Under this test:

> Federal [question] jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. Where all four of these requirements are met . . . jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts.

*Gunn*, 568 U.S. at 258 (quoting *Grable*, 545 U.S. at 313–14). "Federal jurisdiction will lie only if a case meets all four requirements." *Pressl v. Appalachian Power Co.*, 842 F.3d 299, 303 (4th Cir. 2016).

Bloosurf claims that it objected to the sale under Section 11(f) of the EBS Lease on the grounds that "TDI is not eligible to receive the licenses under a variety of federal laws and regulations." (Pl.'s Resp. Opp. 8–9 (citing Compl. ¶¶ 78, 102, 113).) In turn, Bloosurf argues that its right to relief "necessarily depends" on whether T-Mobile is eligible to hold an EBS license under applicable FCC regulations. (*Id.* at 15.) There is no question that this legal theory requires the interpretation of those regulations and raises issues of federal law. However, "the 'mere presence of a federal issue in a state cause of action does not automatically confer federal question jurisdiction.'" *Mayor & City Council of Baltimore*, 31 F.4th at 208–09 (quoting *Merrel Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 810 (1986)) (emphasis omitted). Rather, a plaintiff's right to relief must "*necessarily* depend[] on resolution of a substantial question of federal law" to invoke federal question jurisdiction under *Gunn* and *Grable. Id.* at 208 (quoting *Burrell*, 918 F.3d at 380) (emphasis supplied).

"A federal question is 'necessarily raised' for purposes of § 1331 only if it is a 'necessary element of one of the well-pleaded state claims.'" *Burrell*, 918 F.3d at 381 (quoting *Franchise Tax Bd.*, 463 U.S. at 13). As the United States Court of Appeals for the Fourth Circuit has explained, this is a strict requirement:

> A federal question is not 'necessarily' raised under § 1331 unless it is essential to resolving a state-law claim, meaning that '*every* legal theory supporting the claim requires the resolution of a federal issue.' . . . If, on the other hand, each of the [plaintiff's] claims is supported by a state-law theory that does not require recourse to federal law, then that claim does not 'arise under' federal law—even if the [plaintiff has] alleged an alternative federal-law theory that also could prove liability. . . . In other words, so long as 'even one theory' for each of the [plaintiff's] claims does *not* require 'interpretation of federal law,' resolution of the federal-law question is not necessary to the disposition of their case.

*Id.* at 383 (quoting *Pressl*, 842 F.3d at 303; *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 182 (4th Cir. 2014); *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004)). Expressed differently, when a plaintiff presents a state-law cause of action, a federal question is only "necessarily raised" if the court must address the federal issue to resolve the state-law claim. "[I]f a claim is supported not only by a theory establishing federal subject matter jurisdiction but also by an alternative theory which would not establish such jurisdiction, then federal subject matter jurisdiction does not exist." *Mulcahney v. Columbia Organic Chemicals Co., Inc.*, 29 F.3d 148, 154 (4th Cir. 1994) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 811 (1988)).

Three decisions by the United States Court of Appeals for the Fourth Circuit illustrate the application of this principle. In *Mulcahney v. Columbia Organic Chemicals Co., Inc.*, 29 F.3d 148 (4th Cir. 1994), plaintiffs brought South Carolina tort claims against a chemical company and its officers, claiming that its facility had released pollution onto their property. 29 F.3d at 149. As relevant, plaintiffs invoked negligence on a theory of negligence *per se*, alleging "violations of various enumerated federal, state, and local laws." *Id.* at 150. Defendants removed the case to federal court on the grounds that this negligence theory necessarily raised federal questions, as the plaintiffs cited several federal environmental statutes as a basis for relief. *Id.* The district court denied plaintiffs' motion to remand, but the Fourth Circuit reversed, reasoning that "the negligence *per se* claim citing the federal environmental statutes was only an alternative theory of liability under the Plaintiffs' negligence claim contained in Count I." *Id.* at 153. "Even if Columbia Organic was found not to have violated any federal statute, the Plaintiffs might still be entitled to recover under an alternative theory of negligence," such as the alleged violations

of state and local environmental laws. *Id.* at 153. As "the Plaintiffs' [federal law] theory of negligence *per se* was not 'essential' to their negligence claim," the court held that their mere "reference to federal environmental statutes in their state common law negligence action" was insufficient to confer federal question jurisdiction. *Id.* at 154.

Similarly, in *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811 (4th Cir. 2004), the plaintiff alleged that his employer unlawfully terminated his employment in violation of Section 16-17-560 of the South Carolina Code, an employment discrimination provision that prohibits discharge in violation of either state or federal law. 369 F.3d at 814–15. Plaintiff offered multiple theories in support of this claim, including that his termination violated both the First Amendment of the United States Constitution and Article I, Section 2 of the South Carolina Constitution. *Id.* at 818. The defendant removed the case on the basis that the First Amendment theory was a federal question, and the district court denied plaintiff's motion to remand. *Id.* at 815. Again, the Fourth Circuit reversed, reasoning that "although Dixon's complaint does reference the First Amendment, none of its causes of action rely exclusively on a First Amendment violation to establish Coburg's liability under Section 16-17-560." *Id.* at 818. Analyzing the complaint holistically, the court observed that Dixon offered three alternative theories for his claim under Section 16-17-560, only one of which "arguably involves the resolution of a substantial question of federal law." *Id.* As the plaintiff could establish liability under either alternative theory even in the absence of a First Amendment violation, federal law was not "necessarily" implicated by his state law claims. *Id.*

Finally, in *Pressl v. Appalachian Power Co.*, 842 F.3d 299 (4th Cir. 2016), landowners filed suit in Virginia court, requesting a declaration confirming their rights to construct a dock on

property subject to an easement. 842 F.3d at 301. In their complaint, Plaintiffs asked the court to declare that the defendant power company "has no regulatory authority" over the contested property. *Id.* The power company removed the case on the basis that its plant was operated pursuant to a license from the Federal Energy Regulatory Commission ("FERC"), and that it would be necessary to interpret this license to determine the nature and extent of the parties' rights under the easement. *Id.* at 302–04. The district court agreed, denied plaintiffs' motion to remand, and dismissed the case on the merits, but the Fourth Circuit reversed for lack of subject matter jurisdiction. *Id.* at 303. Once more, the Fourth Circuit emphasized that a claim "necessarily depends on a question of federal law only when <u>every</u> legal theory supporting the claim requires the resolution of a federal issue." *Id.* at 304 (quoting *Flying Pigs*, 757 F.3d at 182). As "the most important factor in interpreting an easement is the language of the easement itself," *id.* at 304, and the easement gave the defendant the right to remove any structure within the contested area, the district court "did not need to analyze the meaning of APCO's license to determine the reasonable limits of the easement," *id.* at 305.

This case follows a similar pattern. Bloosurf's claims turn on whether the threatened termination of the EBS Lease, and the Universities' proposed sale of their EBS licenses to TDI and T-Mobile, would violate the provisions of the EBS Lease. In addressing this issue, "the most important factor" is "the language of the [lease] itself." *Cf. Pressl*, 842 F.3d at 305. As there are multiple ways in which the proposed termination and transfer could contravene the EBS Lease without violating federal law, a court could determine the propriety of the sale without interpreting any of the federal regulations Bloosurf cites in the Complaint. *Cf. Dixon*, 369 F.3d at 818 (noting that the plaintiff could establish liability even if defendant's conduct

did not violate the First Amendment); *Pressl*, 842 F.3d at 305 (reasoning that the court "did not need to analyze the meaning of APCO's license to determine the reasonable limits of the easement" in light of the easement's plain language).

Indeed, Bloosurf presents at least two legal theories to support its claims for injunctive and declaratory relief, only one of which requires any interpretation of the FCC's regulations. Bloosurf's case rests on two lease provisions: (1) Section 7, which prohibits either party from transferring or assigning their rights without the other party's prior written consent, provided that such consent may not "be unreasonably withheld, conditioned, or delayed," (EBS Lease § 7, ECF No. 1-3); and (2) Section 11(f), which further prevents any assignment of rights "to any entity that is ineligible or unqualified to enter into a spectrum leasing agreement under the FCC Rules," (*id.* § 11(f)). The plaintiff presents two distinct theories under these provisions. Under the first, Bloosurf claims that it has reasonably withheld its consent under Section 7 in light of the "devastating impact" that a sale of the Lease to its direct competitor, T-Mobile, would have on its business and its contractual obligations. (Compl. ¶¶ 67–72, 101, 104, 111.) Under the second, Bloosurf claims that the sale would violate Section 11 on the grounds that T-Mobile and its subsidiaries are ineligible to enter the Lease under various FCC regulations. (*Id.* ¶¶ 73–78, 102–03, 112–13.) Success on either theory could be enough to sustain Bloosurf's claims and entitle it to the injunction or declaration it requests. But only the second "arguably involves the resolution of a substantial question of federal law." *Dixon*, 369 F.3d at 818.

Bloosurf nonetheless argues that the federal issue is the gravamen of the case, insisting that "[t]he entire dispute arises out of TDI's eligibility under federal regulations, and whether TDI's status keeps the EBS licenses valid until 2024 and ultimately eligible for renewal." (Pl.'s

Resp. Opp. 15.) The Complaint belies this broad assertion. A holistic reading of the Complaint suggests that Bloosurf is chiefly concerned about the effect the proposed sale would have on its network, its contracts, and its business. Bloosurf devotes an entire section to the contracts it has entered to expand service across the Eastern Shore, the substantial investments it has made to fulfill those contractual obligations, and its reliance on the EBS Lease as a key source of revenue. (Compl. ¶¶ 31–39.) Bloosurf extensively reviews T-Mobile's putative interference with Bloosurf's wireless network—arguing that "[f]urther interference [would be] devastating to Bloosurf's business because it would render it unable to provide adequate services to its consumers," and alleging that T-Mobile intends to purchase the Universities' licenses to take control of Bloosurf's network. (*Id.* ¶¶ 40–57.) And Bloosurf openly declares that it withheld consent based on "the devastating impact" that a sale to an "antagonistic party" would have on its business. (*Id.* ¶¶ 72, 91, 101, 111, 118; *see also id.* ¶ 9 ("Bloosurf is unwilling to consent to a transfer that will resul[t] in the termination of its wireless internet services on the Eastern Shore and force it to default on its remaining obligations through 2029.").)

Bloosurf's pending motion for preliminary injunction further demonstrates its reliance on its Section 7 theory. In its memorandum supporting its motion, Bloosurf explains that the threatened termination of the EBS Lease and sale of the Universities' licenses "would be crippling to its business throughout the Eastern Shore," as "the EBS Licenses leased by Bloosurf are the backbone of its business." (Pl.'s Mem. Supp. Mot. Prelim. Inj. 8, ECF No. 9-1; *see also id.* at 8–9 ("If no injunction is granted and the lease is terminated, Bloosurf's business would be irreparably destroyed without the possibility of restoration given its reliance on the leased frequency licenses for its . . . government contracts and grants.").). Moreover, Bloosurf's

theory for success on the merits, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–21 (2008), is that it "has reasonably withheld consent to the assignment of the lease to TDI and any termination by the Universities would not be warranted or permitted by the terms of the lease." (Pl.'s Mem. Supp. Mot. Prelim. Inj. 9.)

It follows that Bloosurf's case can be decided without reaching any federal question. As Bloosurf asserts, it is entirely possible that the sale may violate Section 11(f) if T-Mobile is ineligible to hold an EBS license under the various FCC regulations cited in the Complaint. But like the negligence *per se* theory at issue in *Mulcahney*, 29 F.3d at 153, the First Amendment theory addressed in *Dixon*, 369 F.3d at 818, and the federal license interpretation issue raised in *Pressl*, 842 F.3d at 304, this regulatory argument is only one "alternative theory of liability" in support of Bloosurf's claims. *See Burrell*, 918 F.3d at 384 (quoting *Mulcahney*, 29 F.3d at 153). Even if T-Mobile is fully eligible to hold the Universities' EBS licenses under FCC regulations, the proposed sale may independently violate Section 7 if Bloosurf reasonably withheld its consent based on its concerns that the sale would cripple its network, undermine its business, and bring it in breach of its various contractual obligations. That theory does not require any analysis of federal law. Determining whether Bloosurf's refusal to consent was reasonable requires only an evaluation of the facts, a holistic consideration of the parties' dealings, and an interpretation of the lease under the law of Maryland.

In sum, Bloosurf's challenge to the proposed sale does not "necessarily depend[] on resolution of a substantial question of federal law." *Mayor & City Council of Baltimore*, 31 F.4th at 208 (quoting *Burrell*, 918 F.3d at 380). *Cf. Dixon*, 369 F.3d at 818 ("[A]lthough Dixon's complaint does reference the First Amendment, none of its causes of action rely exclusively

on a First Amendment violation to establish Coburg's liability."). Although Bloosurf may receive an injunction under Section 11 if the sale would violate FCC regulations governing use of the EBS spectrum, it may also block the sale on the theory that it reasonably withheld its consent under Section 7—a theory central to Bloosurf's allegations and entirely detached from the federal regulations it invokes. As Bloosurf's claims for injunctive and declaratory relief do not "necessarily raise" issues of federal law, this case falls outside the ambit of this court's subject matter jurisdiction. *Gunn*, 568 U.S. at 258. Accordingly, the Universities' Motions to Dismiss (ECF Nos. 20, 22) are hereby **GRANTED,** and Bloosurf's Motion for Preliminary Injunction (ECF No. 9) is hereby **DENIED** as moot.

## CONCLUSION

For the reasons set forth above, it is this 21st day of July, 2023, hereby **ORDERED** that Defendants' Motions to Dismiss are hereby **GRANTED**, and Plaintiff's Motion for Preliminary Injunction is hereby **DENIED** as moot.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Plaintiff Bloosurf, Inc.'s Complaint (ECF No. 1) is hereby **DISMISSED** for lack of subject matter jurisdiction. "The determination whether to dismiss with or without prejudice under Rule 12(b)(6) is within the discretion of the district court." *Weigel v. Maryland*, 950 F. Supp. 2d 811, 825 (D. Md. 2013). However, Rule 15(a) contemplates that leave to amend a complaint to address deficiencies in an original complaint should be freely granted when justice so requires. *See* Schwarzer, Wallace & Wagstaffe, *Federal Civil Procedure* § 9:286. Indeed, there is authority that a plaintiff should be afforded at least one opportunity to amend a complaint before a dismissal of the case with prejudice. *See Silva v. Bieluch*, 351 F.3d 1045, 1048 (11th Cir. 2003). Leave to amend may be

denied if such amendment is deemed futile. *See* Schwarzer, Wallace & Wagstaffe, *Federal Civil Procedure* § 9:294.1; *see also Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008).

      For the reasons set forth in this opinion, Plaintiff Bloosurf, Inc., does not allege any federal cause of action, nor any state cause of action that arises from federal law. However, the record reflects that Bloosurf has not been afforded an opportunity to amend its Complaint. Accordingly, the dismissal of Bloosurf's Complaint is **WITHOUT PREJUDICE,** and with leave to amend. If Bloosurf possesses a cause of action sufficient to cure the jurisdictional defects outlined in this opinion, it may file an Amended Complaint within **thirty (30) days** of this opinion, *i.e.*, by August 21, 2023.[5] Such an Amended Complaint may still be subject to dismissal by reason of repeated failure to cure deficiencies or by futility of the amendment. *See Abagninin*, 545 F.3d at 742. If an Amended Complaint is not filed by August 21, 2023, the Clerk of this Court is instructed to close this case with a dismissal with prejudice.

      A separate order follows.

                                      _____/s/_____

                                        Richard D. Bennett
                                        United States Senior District Judge

---

[5] The time within which plaintiff must serve and file the amended complaint is ordinarily set by the court. Schwarzer, Wallace & Wagstaffe, *Federal Civil Procedure* § 9:289. Although August 20, 2023, is precisely thirty days following this opinion, that day is a Sunday. Consequently, Bloosurf shall be afforded until Monday, August 21, 2023, to file an Amended Complaint. *See* Fed. R. Civ. P. Rule 6(a)(1)(C) (providing that when a time period is stated in days, the court must "include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday").